STATE OF NORTH CAROLINA v. TONY EARL STATEN

No. COA03-1216

(Filed 16 August 2005)

### 1. Constitutional Law— capacity to stand trial—failure to sua sponte grant competency hearing

The trial court was not required to sua sponte grant defendant a competency hearing during defendant's January 2003 trial for first-degree felony murder and armed robbery, because: (1) evidence before the trial court was not so substantial as to indicate defendant was mentally incompetent when throughout the trial proceedings defendant acted in a manner exhibiting competence; (2) in the instant case, with the exception of the initial screening, defendant had no evaluations finding him to be incompetent to proceed to trial; (3) neither defendant's behavior nor demeanor implicated the necessity of a bona fide doubt inquiry even though defendant suffered from mental retardation and intellectual deficiencies throughout his life with intermittent mental illness when defendant had the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to assist his counsel; and (4) where, as here, defendant has been examined relative to his capacity to proceed and all evidence before the court indicates that he has that capacity, he is not denied due process by the trial court's failure to hold a competency hearing.

### 2. Criminal Law— insanity—directed verdict

The trial court did not err in a first-degree felony murder and armed robbery case by denying defendant's motion for a directed verdict on the issue of insanity because if evidence of insanity is offered by defendant, even if uncontroverted, the credibility of that testimony is for the jury and thus precludes the entry of a directed verdict for defendant on insanity.

### 3. Robbery— armed—instruction—diminished capacity—specific intent

The trial court did not err by denying defendant's request for a special instruction on diminished capacity for intent to commit armed robbery, because defendant failed to show he did not have the specific intent to permanently deprive the victim of his car.

**4. Robbery— armed—heart attack—use of hands—lesser-included offense of common law robbery**

The evidence was insufficient to support defendant's conviction of armed robbery and the case is remanded for entry of conviction on the lesser-included offense of common law robbery, because: (1) autopsy reports indicated the victim died of a heart attack; (2) a forensic pathologist testified that the victim sustained minor cuts and abrasions prior to his death that were not life threatening, and that the victim's death was caused by a combination of the victim's weak heart and the stress caused by defendant stealing his car; and (3) defendant used only his hands to overtake the elderly victim and remove him from his car.

**5. Homicide— felony murder—underlying felony merges with felony murder conviction**

The trial court erred in a first-degree felony murder case by failing to arrest judgment on the underlying armed robbery conviction, because: (1) the underlying offense merged with the felony murder conviction; and (2) the Court of Appeals' decision to reverse and remand the conviction with instructions to the trial court to impose a verdict as to common law robbery means the judgment is arrested on the common law robbery conviction.

Appeal by defendant from judgment dated 29 January 2003 by Judge J. Richard Parker in Gates County Superior Court. Heard in the Court of Appeals 26 May 2004.

*Attorney General Roy Cooper, by Joan M. Cunningham, for the State.*

*Massengale & Ozer, by Marilyn G. Ozer, for the defendant.*

BRYANT, Judge.

Tony Earl Staten (defendant) appeals from a judgment consistent with a jury verdict dated 29 January 2003 finding him guilty of first-degree (felony) murder and armed robbery.

*Facts*

Defendant reported to Hertford County Superior Court on the morning of 6 September 2000 to settle three traffic tickets. While in the courtroom, defendant became upset with the courtroom staff. The trial judge asked defendant to leave the courtroom and return when he calmed down. Instead, defendant walked out of the courtroom and away from the courthouse, heading north on U.S. High-

way 13 from Hertford County toward Gates County. At about 10:30 a.m., Trooper Jason Jones of the North Carolina State Highway Patrol, was patrolling U.S. Highway 13 near Winton, North Carolina, when he saw defendant. Thinking defendant may have had car trouble, Trooper Jones asked defendant if he needed help. Defendant, who was holding a Bible, responded by asking Trooper Jones whether he knew "the Lord?" Trooper Jones responded, "Yes" and again asked defendant if he needed any help. Defendant said, "No" and Trooper Jones left. Defendant was not aggressive, nor did he appear to be angry or frightened.

Later that morning at 11:45 a.m., Trooper Michael Warren saw defendant walking down U.S. Highway 13. Defendant motioned for Trooper Warren to pull over and he did so. Trooper Warren asked defendant his name and where he was going. Defendant asked Trooper Warren for a ride but did not indicate where he wanted to go. Trooper Warren then pulled away, heading north on U.S. Highway 13 and observed defendant also continue walking north.

At about noon that same day, Penny Atkins Rose was driving north on U.S. Highway 13. After crossing the bridge at Winton, Rose saw Abraham Boone at the side of the road on his hands and knees. He was missing one shoe and was not wearing a hat or glasses. She stopped and called 911 for assistance. She attempted to talk to him, but failed to understand Boone's responses as "he seemed to slip into unconsciousness." Rose returned to her car and, concerned for Boone's survival, again called for assistance.

Alice Sharpe, who was also driving by, realized there was an emergency and stopped to help. By that time, Boone was completely unconscious. Emergency personnel testified Boone had no pulse and was not breathing by the time he arrived at the hospital. Medical testimony revealed Boone died as a result of a heart attack and that the scrapes and abrasions on Boone were consistent with a confrontation.

Isaiah Harrell testified that on the afternoon of 6 September 2000 while at a stop sign his car was hit in the rear end by defendant. Defendant jumped out of the car he was driving, opened Harrell's door, hit Harrell in the stomach and pulled him out of his car. Defendant then got in Harrell's car and sped off, leaving Harrell standing in the intersection.

Deputy Tim Lassiter, of the Hertford County Sheriff's Department received a call reporting a car jacking at about noon on 6 September 2000. Meanwhile, officers from the Ahoskie Police Department were

chasing defendant who was driving recklessly at a high rate of speed. Deputy Lassiter saw defendant turn his car and crash directly into the vehicle of Deputy Mike Stephenson also of the Hertford County Sheriff's Department. After struggling with several officers, defendant was arrested and taken into custody.

Later that afternoon, defendant spent approximately half an hour giving a detailed statement to law enforcement officials. Defendant said he recalled seeing Troopers Jones and Warren, stating he thought at the time they were going to kill him. He also recalled flagging down Boone, pulling him out of the car and then driving off, leaving Boone "beside the road laying down." He remembered observing that the car he had stolen from Boone was "hot" and wanting to get rid of it. Finally, he recounted taking Harrell's car.

*Procedural History*

Defendant was served with warrants issued 6 September 2000 charging him with common law robbery and first-degree (felony) murder of Boone. Defendant was later indicted for one count of felony murder and one count of armed robbery as to Boone. Defendant was not charged with any offenses as to Harrell. On 18 September 2000, Gates County District Court Judge Carlton Cole issued an order for a forensic screening examination of defendant over defense counsel's objection. Three days later, on 21 September 2000, Ms. Chamberlee Trowell, forensic screening examiner and Licensed Psychologist Associate (L.P.A.), found defendant incapable of proceeding to trial, noting defendant "would not cooperate" during the assessment and was "noncompliant with treatment and . . . medications" for his previously diagnosed paranoid schizophrenia. In a report dated 28 May 2001, Dr. Hilkey, a forensic psychologist, indicated defendant was competent to stand trial after having interviewed him on 24 January and again on 21 March 2001. On 11 February 2002, defendant's motion for a pre-trial hearing to determine mental retardation came on for hearing in Chowan County[1]. Superior Court Judge J. Richard Parker ruled on defendant's motion and, on 18 February 2002, ordered the case tried as noncapital, finding defendant to be mentally retarded.

Thereafter, defendant was evaluated by Dr. James G. Groce, a forensic psychiatrist who, in a report dated 18 June 2002, found defendant capable of proceeding to trial. Defendant was again examined on 2 July 2002 by Dr. Hilkey, who concluded defendant op-

---

1. Attorneys for the State and defendant agreed to a change of venue for the purpose of conducting the hearing on defendant's motion.

erated under a delusional belief system on the date of the offenses, but deferred assessment of his competency to stand trial until a date closer to trial. The day before trial on 4 August 2002, Dr. Hilkey evaluated defendant and reported "despite defendant's apparent competency to proceed [to trial], he remains fixed in his delusional belief system."

Defendant's first trial, held on 5 August 2002 in Gates County Superior Court before Judge Jerry Tillett, ended in a mistrial when the jury was unable to reach a unanimous verdict. The case was retried on 21 January 2003, before Judge J. Richard Parker. On 28 January 2003, the jury found defendant guilty of first-degree (felony) murder and armed robbery. The trial court sentenced defendant to life in prison without parole on the first-degree (felony) murder conviction, and to a concurrent sentence of 100 to 129 months on the armed robbery conviction. Defendant appeals.

---

Defendant raises five issues on appeal: (I) whether the trial court was required to *sua sponte* grant defendant a competency hearing at trial; (II) whether the trial court erred by denying defendant's motion for a directed verdict on the issue of insanity; (III) whether the trial court erred by denying defendant's request for jury instructions on diminished capacity; (IV) whether the trial court erred by instructing the jury that defendant's use of hands constituted armed robbery; and (V) whether the trial court failed to arrest judgment on the underlying armed robbery conviction.

I

[1] Defendant asserts the trial court was required to *sua sponte* grant defendant a competency hearing; that the trial court in fact had a constitutional duty to conduct a competency hearing during his January 2003 trial. We disagree. In reviewing the evidence before the trial court of defendant's competency and the applicable law, we are persuaded the trial court was not required to *sua sponte* conduct a competency hearing, and therefore, did not err in failing to do so.

Pursuant to N.C. Gen. Stat. § 15A-1001:

(a) No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.

N.C.G.S. § 15A-1001 (2003).

The question of capacity may be raised at any time by motion of the prosecutor, the defendant or defense counsel, or the court. N.C. Gen. Stat. § 15A-1002(a) (2003). Once a defendant's capacity to stand trial is questioned, the trial court must hold a hearing pursuant to N.C. Gen. Stat. § 15A-1002(b) (2003). "A defendant has the burden of proof to show incapacity or that he is not competent to stand trial." *State v. O'Neal*, 116 N.C. App. 390, 395, 448 S.E.2d 306, 310 (1994) (citing *State v. Gates*, 65 N.C. App. 277, 283, 309 S.E.2d 498, 502 (1983)).

"The test for capacity to stand trial is whether a defendant has capacity to comprehend his position, to understand the nature of the proceedings against him, to conduct his defense in a rational manner and to cooperate with his counsel so that any available defense may be interposed." *State v. Jackson*, 302 N.C. 101, 104, 273 S.E.2d 666, 669 (1981) (citations omitted). It is well established that the court gives significant weight to defense counsel's representation that a client is competent, since counsel is usually in the best position to determine if his client is able to understand the proceedings and assist in his defense. *State v. McRae*, 163 N.C. App. 359, 369, 594 S.E.2d 71, 78, *disc. review denied*, 358 N.C. 548, 599 S.E.2d 911 (2004) (hereinafter *McRae II*)[2]. So long as there is competent evidence to support the findings of fact, a trial court's conclusion that a defendant is competent to proceed to trial will not be disturbed, even if there is evidence to the contrary. *State v. Heptinstall*, 309 N.C. 231, 234, 306 S.E.2d 109, 111 (1983).

"A trial court has a constitutional duty to institute, *sua sponte*, a competency hearing *if there is substantial evidence that the accused may be mentally incompetent*." *State v. Young*, 291 N.C. 562, 568, 231 S.E.2d 577, 581 (1977) (emphasis added) (internal quotation marks omitted). In other words, a trial judge is required to hold a competency hearing when there is a *bona fide* doubt as to the defendant's competency even absent a request. *Meeks v. Smith*, 512 F. Supp. 335, 338 (W.D.N.C. 1981).

"Evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant to a *bona fide* doubt inquiry." *McRae I*, 139 N.C. App. at

---

2. We use *McRae I* and *II* to distinguish the two appeals. In *McRae I*, (*State v. McRae*, 139 N.C. App. 387, 533 S.E.2d 557 (2000) (hereinafter *McRae I*)), this court ordered a Retrospective Competency Hearing (RCH) following defendant's first-degree murder conviction. In *McRae II*, (*State v. McRae*, 163 N.C. App. 359, 594 S.E.2d 71 (2004)), the defendant appeals a second time following an RCH. An RCH serves as a substitute for the hearing provided under N.C.G.S. § 15A-1002.

390, 533 S.E.2d at 559 (quoting *Drope v. Missouri*, 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118 (1975)). "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *State v. Snipes*, 168 N.C. App. 525, 529, 608 S.E.2d 381, 385 (N.C. Ct. App. 2005) (quoting *Drope*, 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118); *see also Heptinstall* at 233-34, 306 S.E.2d at 110-11 (where forensic psychologist testified the defendant was alert, aware of his surroundings, able to understand the seriousness of the charges against him and capable of assisting his attorneys in preparing his defense, this was sufficient evidence to support a trial court's determination the defendant was capable of proceeding to trial despite the defendant's "bizarre and nonsensical" testimony and substantial testimony from numerous family members regarding defendant's lengthy history of mental illness).

A review of the court proceedings in the instant case indicates defendant was competent and fit to proceed to trial. When defense counsel informed the trial court defendant would be testifying, the trial court on *voir dire* conducted a colloquy concerning the voluntariness of defendant's testimony and defendant's understanding of possible outcomes:

THE COURT: Have you got some witnesses here to testify?

[DEFENSE COUNSEL]: Yes, sir, Your Honor, and before we proceed any further . . . I have talk[ed] to Mr. Staten . . . again and he has told me he definitely wants to take the witness stand and testify in his own behalf.

I have gone over the pros and cons of that with him, but would ask the Court to make inquiry of him at this point in time with the jury being out of the room so that it would be on the record.

THE COURT: All right. Mr. Staten, you have talked to your attorney concerning the question of whether or not you should testify or not [sic] in this case?

MR. STATEN: Yes sir.

THE COURT: And you understand that if you do testify the State can ask you a lot of questions on cross-examination about your prior record and things of that nature?

MR. STATEN: Yes sir.

THE COURT: And you understand that may sway the jury somewhat? Sometimes it does. And it could be that it doesn't work out to your advantage.

MR. STATEN: Yes sir.

THE COURT: Are you telling me now that even though you understand the consequences of your decision to testify you still want to go through with it?

MR. STATEN: I want to testify and tell everybody like came [sic] behind me and testified after I already testified and say something about me and I want to testify again to clear up what they have said like we did the last time.

. . .

THE COURT: All right. You want to do it again today?

MR. STATEN: Yes, sir.

THE COURT: All right. I just want you to understand what the consequences are of your decision.

MR. STATEN: Thank you.

During the colloquy, defendant's replies were lucid and responsive, demonstrating his desire to testify and displaying his understanding of the consequences of doing so. In fact, such inquiry and response between the trial court and defendant are in the very nature of a competency hearing. *See, e.g., State v. Gates*, 65 N.C. App. 277, 282, 309 S.E.2d 498, 502 (1983) (Noting "although [N.C. Gen. Stat. § 15A-1002 (b)(3)] requires the court to conduct a hearing when a question is raised as to a defendant's capacity to stand trial no particular procedure is mandated. The method of inquiry is still largely within the discretion of the court."). However, we refrain from making a determination of whether such a colloquy between the trial court and defendant was sufficient to conform to the type of competency hearing anticipated under N.C.G.S. § 15A-1002(b)(3), as the arguments in the briefs of the State and defendant appear to assume no competency hearing was held by the trial court.

Therefore, our inquiry centers on whether constitutional due process required the trial court to *sua sponte* conduct a competency hearing in this case. In considering this inquiry we acknowledge there are many cases which discuss capacity to proceed to trial, and note the dual nature courts face: on the one hand "our Supreme Court has

recognized that a defendant may waive the benefit of statutory constitutional provisions by express consent, failure to assert it in apt time, or by conduct inconsistent with a purpose to insist upon it." *Young* at 567, 231 S.E.2d at 580 (1997) (internal quotation marks omitted). On the other hand our Supreme Court "has also recognized that a trial court has a constitutional duty to institute, *sua sponte*, a competency hearing *if there is substantial evidence before the court* indicating that the accused may be mentally incompetent." *Snipes* at 529, 608 S.E.2d at 384 (emphasis added) (internal quotation marks omitted).

In the instant case, evidence before the trial court was not so substantial as to indicate defendant was mentally incompetent. Throughout the trial proceedings, defendant acted in a manner exhibiting competence. In his testimony he recounted in chronological order the events leading to Boone's death. He gave rational, responsive answers to questions during direct and cross examination and was able to recall and describe events in detail. In response to the trial court's request to "simply answer counsel's questions" defendant "apologize[d] for [his] lengthy responses as [he was] only trying to explain." Although sometimes a bit bizarre, defendant's testimony for the most part was coherent and displayed defendant's understanding of the proceedings.

Nevertheless, defendant argues his "psychotic testimony" and mental health history raised a *bona fide* doubt, as was found in *McRae I*, such that he is entitled to a new trial. *See McRae I*. Based on the reasoning and result of *McRae I*, defendant would be entitled at most to an RCH, not a new trial. In *McRae I*, the defendant was deemed competent to stand trial after undergoing at least six psychiatric evaluations and three competency hearings, all finding him incompetent. A mistrial resulted when the jury was unable to reach a verdict. McRae was retried immediately, and even though he underwent a psychiatric evaluation between the two trials, the trial court did not conduct another competency hearing prior to the second trial. McRae was convicted of murder. On appeal, this Court in *McRae I* remanded the case back to the trial court to conduct an RCH, which RCH subsequently determined McRae was indeed competent to stand trial. McRae then appealed the RCH determination of competency and this Court, in *McRae II*, affirmed the judgment of the trial court, holding there was sufficient evidence McRae was competent to stand trial based on the medical evidence of competency and where his trial attorney never raised the competency issue. *McRae II* at 369, 594

S.E.2d at 78. The Court said, "[w]e hold this to be 'competent evidence' [that defense counsel raised no question of competency and therefore presented his client as competent] supporting the trial judge's determination that defendant was competent during the 11 May 1998 trial." *Id.* (the trial court's conclusions at an RCH are reviewed under an abuse of discretion standard).

Our Court in *McRae II* acknowledged the trial court's discretion and recognized the important role of the trial court.

> The trial court is in the best position to determine whether it can make such a retrospective determination of defendant's competency. Thus, if the trial court concludes that a retrospective determination is still possible, a competency hearing will be held, and if the conclusion is that the defendant was competent, no new trial will be required.

*McRae II* at 367, 594 S.E.2d at 77-78 (citing *McRae I* at 392, 533 S.E.2d at 560-61 (2000)). The *McRae* opinions illustrate why our appellate courts must carefully evaluate the facts in each case in determining whether to reverse a trial judge for failure to conduct *sua sponte* a competency hearing where the discretion of the trial judge, as to the conduct of the hearing and as to the ultimate ruling on the issue, is manifest.[3] *See McRae II* at 367, 594 S.E.2d at 77 (noting the RCH "remedy is disfavored due to the inherent difficulty in making such *nunc pro tunc* evaluations").

While we acknowledge *McRae's* procedural history in our Court and the constitutional underpinnings upon which it is based, we decline to order an RCH in the instant case based on *McRae*. In so doing we note that in *McRae I* this Court determined a *bona fide* doubt existed based on seven prior and conflicting evaluations and three prior competency hearings in which defendant was found by the trial judge to be incompetent to proceed to trial. *McRae I* said the trial court's failure to conduct a competency hearing under these circumstances violated defendant's constitutional due process rights. *McRae II* at 361, 594 S.E.2d at 74; *see also Meeks*, 512 F. Supp. at 338 (court required to conduct hearing where defendant had seven conflicting

---

3. Pursuant to N.C.G.S. § 15A-1002(a), the issue of capacity (or competency) is within the "trial court's discretion, and [the] determination thereof, if supported by the evidence, is conclusive on appeal." *State v. Wolfe*, 157 N.C. App. 22, 30, 577 S.E.2d 655, 661, *disc. review denied*, 357 N.C. 255, 583 S.E.2d 289 (2003); *State v. Reid*, 38 N.C. App. 547, 548-49, 248 S.E.2d 390, 391 (1978), *disc. review denied*, 296 N.C. 588, 254 S.E.2d 31 (1979).

**STATE v. STATEN**

[172 N.C. App. 673 (2005)]

psychiatric examinations, at least three finding him to be incompetent to proceed).

In the instant case, on at least four occasions defendant was evaluated and conclusions entered regarding his competency to proceed to trial. Defendant's first evaluation was actually an assessment conducted more than two years prior to trial by a forensic screener who determined defendant to be incompetent to stand trial, acknowledging that defendant would not cooperate with the assessment and that he refused to take his medication. In the other three evaluations, conducted by a psychologist and a psychiatrist, defendant was determined to be competent to stand trial. The other three psychological and psychiatric evaluations finding defendant competent to stand trial were conducted over the two years prior to defendant's trial, with the last one conducted on 4 August 2002, one day before defendant's first trial.[4] Therefore, unlike *Meeks* and *McRae*, with the exception of the initial screening, defendant had no evaluations finding him to be incompetent to proceed to trial.

Moreover, neither defendant's behavior nor demeanor implicates the necessity of a *bona fide* doubt inquiry. While it is true defendant suffered from mental retardation and intellectual deficiencies throughout his life, and experienced periods of intermittent mental illness which was based in a delusional belief system, the evidence in the record pertaining to defendant's competency at the time of his trial, including the trial transcript, defendant's voluntary testimony and the extensive medical records and expert testimonies, all suggest there was never a *"bona fide* doubt" as to defendant's competency to stand trial. Here, defendant took the stand willingly in his own defense and testified clearly to the events leading up to Boone's death. He exhibited proper courtroom decorum and a desire to cooperate in the process. In his testimony, defendant tried to convince the court and the jury that his hallucinations were real, denying all crim-

---

4. Dr. Hilkey on 28 May 2001 stated: "It is my opinion that while Mr. Staten has significant psychological disorders, these problems do not currently interfere with his ability [to] consult with his attorneys, to understanding the charges lodged against him and comprehend the potential penalties."

Dr. Groce on 21 May 2002 found: "Mr. Staten is currently capable of proceeding to trial. He understands the charges against him, the seriousness of those charges, and his own position relative to the proceedings. He is currently capable of working with an attorney in the preparation of a defense."

Dr. Hilkey on 4 August 2002 determined defendant competent to proceed to trial despite the fact defendant remained "fixed in his delusional belief system."

inal culpability throughout, and apologizing when his explanations were too lengthy.

Reviewing the trial transcripts and other records of this proceeding we cannot conclude the trial court had before it sufficient objective facts showing defendant "lack[ed] the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense at the time his trial commenced." *Snipes* at 530, 608 S.E.2d at 384. Instead, we hold that defendant had the capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to assist his counsel. *Heptinstall* at 236, 306 S.E.2d at 112. As we stated in *Young*, "where, as here, the defendant has been . . . examined relative to his capacity to proceed, and all evidence before the court indicates that he has that capacity, he is not denied due process by the failure of the trial judge to hold a hearing." *Young* at 568, 231 S.E.2d at 581. This assignment of error is overruled.

II

**[2]** Defendant next argues the trial court erred by denying his motion for a directed verdict on the issue of insanity. We disagree. "If evidence of insanity is offered by the defendant, even if un-controverted, the credibility of that testimony is for the jury and thus precludes the entry of a directed verdict for defendant on insanity." *State v. Dorsey*, 135 N.C. App. 116, 118, 519 S.E.2d 71, 72 (1999).

A defense of insanity may absolve defendant of criminal responsibility if he proves to the satisfaction of the jury that at the time of the act, he was laboring under such a defect of reason caused by disease or a deficiency of the mind that he was incapable of knowing the nature and quality of his act, or, if he did know the quality of his act, he was incapable of distinguishing between right and wrong in relation to the act. *State v. Bonney*, 329 N.C. 61, 78, 405 S.E.2d 145, 155 (1991); *State v. Mancuso*, 321 N.C. 464, 469, 364 S.E.2d 359, 363 (1988); *State v. Evangelista*, 319 N.C. 152, 161, 353 S.E.2d 375, 382 (1987); *State v. Mize*, 315 N.C. 285, 289, 337 S.E.2d 562, 565 (1985). Every person is presumed sane and the burden of proving insanity is "properly placed on the defendant in a criminal trial." *State v. Leonard*, 296 N.C. 58, 64, 248 S.E.2d 853, 856 (1978) (diagnosis of mental illness by expert is not conclusive on issue of insanity).

Defendant presented medical expert testimony through Dr. Groce and Dr. Hilkey. Dr. Groce testified defendant knew the nature and

quality of his actions on the day of the offense but did not "understand that what he was doing was wrong." Also, and perhaps more significantly, Dr. Groce stated if he were to offer any opinion as to defendant's state of mind on the date of the offense that opinion would only be his "best guess" and not a medical conclusion.

Dr. Hilkey testified he had changed his mind during the course of the (second) trial and thereafter gave his opinion that defendant satisfied both prongs of the insanity test, stating defendant was insane at the time of the offense. This testimony at the second trial was different from his testimony at the first trial where Dr. Hilkey testified defendant was incapable of understanding the nature and quality of his actions and therefore insane under only one prong of the insanity test.

On the issue of insanity, the jury was left to weigh the credibility of the evidence as presented by the experts in the second trial. *See Dorsey* at 118, 519 S.E.2d at 73. The trial court properly denied defendant's motion for a directed verdict. This assignment of error is overruled.

## III

**[3]** Defendant next argues the trial court erred in denying his request for a special instruction on diminished capacity, contending the evidence of defendant's mental illness was sufficient to support a diminished capacity instruction on intent to commit armed robbery. We disagree.

"An instruction on diminished capacity is warranted where evidence of defendant's mental condition is sufficient to cause a reasonable doubt in the rational trier of fact as to whether defendant has the ability to form the necessary specific intent." *State v. Clark*, 324 N.C. 146, 163, 377 S.E.2d 54, 64 (1989). The defense of diminished capacity neither justifies nor excuses the commission of an offense, but rather negates only the element of specific intent, and the defendant could still be found guilty of a lesser included offense. *See, e.g., State v. Holder*, 331 N.C. 462, 473-74, 418 S.E.2d 197, 203-04 (1992).

In *State v. Lancaster*, 137 N.C. App. 37, 44, 527 S.E.2d 61, 66-67, *disc. review denied in part and allowed in part on other grounds*, 352 N.C. 680, 545 S.E.2d 723 (2000), this Court found that despite the defendant's testimony about alcohol and drug use on the night of the offense, there was insufficient evidence of his mental condition at the time to support the diminished capacity instruction.

In the instant case, defendant testified at trial and provided chronologically and factually accurate testimony as to his actions leading up to his arrest on 6 September 2000. Further, after his arrest defendant gave a detailed statement describing how he pulled Boone out of his car and left him lying beside the road as he drove away in Boone's car. Dr. Groce and Dr. Hilkey both gave expert testimony that defendant's behaviors were influenced by his belief that he was fleeing for his life on 6 September 2000. Dr. Groce testified that when defendant took Boone's car, he knew he could get away faster in a car than on foot, knew he was taking a car, knew he was on a highway and knew he had just spoken with a police officer. Defendant was aware of what he was doing, he rationalized his actions as they occurred and he recounted the sequence of events at trial. Defendant has failed to present substantial evidence of diminished capacity; specifically, defendant failed to show he did not have the specific intent to permanently deprive Boone of his car. The trial court's denial of the diminished capacity instruction was proper. This assignment of error is overruled.

IV

**[4]** Defendant next argues the armed robbery judgment should be overturned because hands cannot be deemed dangerous weapons.

N.C. Gen. Stat. § 14-87, Robbery with firearms or other dangerous weapons states:

(a) Any person or persons who, having in possession or with the use or threatened use of any firearms or other dangerous weapon, implement or means, whereby the life of a person is endangered or threatened, unlawfully takes or attempts to take personal property from another or from any place of business, residence or banking institution or any other place where there is a person or persons in attendance, at any time, either day or night. . . .

N.C.G.S. § 14-87 (2003).

If there is insufficient evidence of the greater offense but sufficient evidence of the lesser included offense, the court should treat the jury's verdict as a verdict of guilty of the lesser included offense. *See* N.C. Gen. Stat. § 15-170 (2003) ("Upon the trial of any indictment the prisoner may be convicted of the same crime, or of an attempt to commit the crime so charged, or of an attempt to commit a lesser

degree of the same crime."); *see also State v. Jolly*, 297 N.C. 121, 130, 254 S.E.2d 1, 7 (1979).

Autopsy reports indicate Boone died of a heart attack. The autopsy reports also indicate the scrapes, abrasions and bruises on Boone's body show that, because his heart stopped, there was not enough time for the blood to flow to these wounds before Boone's death. Forensic pathologist Dr. M.G.F. Gilliland testified Boone sustained minor cuts and abrasions prior to his death that were not life threatening; that Boone's death was caused by a combination of his weak heart and the stress caused by defendant stealing his car.

Here, defendant testified he used only his hands to overtake Boone and remove him from his car:

> [Boone] was coming from the Gates County war. I stuck my hand out. I am flagging him down for him to stop. Not that I ever did assault him, all I did—when I was in front of this car, he tried— he tried to drive around me and keep going because there was a whole lot of cars in the street. [Boone] pulled over to the right. That is when I went around to the passenger side. He tried to take off and the car wouldn't even move. And so then after I said, I need your car. I need your car. He still tried to take off. I undone his seat belt and I took my hand and pulled him (Defendant standing up.) . . . I pulled my hand—I pulled him out to the side and jumped in the car and took off . . . [i]f I would have hit a man that old, I would really did more than put a little scratch on his nose.

Taking the evidence in the light most favorable to the State, the evidence is insufficient to support a conviction of armed robbery. *See State v. Easterling*, 300 N.C. 594, 604, 268 S.E.2d 800, 806-07 (1980) (evidence must be considered in the light most favorable to the State and the State is entitled to every reasonable inference therefrom). However, the evidence is sufficient to support a conviction of the lesser-included offense of common law robbery. Common law robbery is a lesser-included felony offense of armed robbery. *See State v. Norris*, 264 N.C. 470, 473, 141 S.E.2d 869, 871-72 (1965). Common law robbery requires proof of four elements: (1) felonious, non-consensual taking of (2) money or other personal property (3) from the person or presence of another (4) by means of force. *State v. Hedgecoe*, 106 N.C. App. 157, 161, 415 S.E.2d 777, 780 (1992). Therefore, although the evidence fails to support a conviction of armed robbery, it nevertheless is sufficient to support a conviction of the lesser included offense of common law robbery, which can prop-

erly serve as the underlying felony for defendant's first-degree felony murder conviction. *State v. Vance*, 328 N.C. 613, 623, 403 S.E.2d 495, 502 (1991). Therefore we reverse defendant's armed robbery conviction and remand to the trial court with instructions to enter a judgment against defendant as a verdict finding him guilty of common law robbery.

V

[5] Defendant next argues the trial court erred when it failed to arrest judgment on the underlying armed robbery conviction. We agree the trial court erred in not arresting judgment and sentencing defendant on the underlying armed robbery conviction.

It is undisputed that when a defendant is convicted of first-degree murder pursuant to the felony murder rule, and a verdict of guilty is returned on the underlying felony, this latter conviction provides no basis for an additional sentence, hence it merges into the murder conviction, and any judgment imposed on the underlying felony must be arrested. *State v. Silhan*, 302 N.C. 223, 261-62, 275 S.E.2d 450, 477 (1981), *overruled in part by State v. Sanderson*, 346 N.C. 669, 488 S.E.2d 133 (1997).

Here, the trial court properly sentenced defendant to life imprisonment for the first-degree (felony) murder of Boone. However, because the underlying offense merged with the felony murder conviction, it was error to sentence defendant for the underlying offense. Because we have reversed and remanded the conviction of armed robbery with instructions to the trial court to impose a verdict as to common law robbery, we arrest judgment on the common law robbery conviction.

Conclusion

In conclusion, we find there was no error at trial, we reverse defendant's armed robbery conviction and remand with instructions for entry of a verdict on common law robbery. Judgment is arrested and the sentence vacated as to common law robbery.

No error in part; Reversed and remanded in part; Vacated in part.

Judges TYSON and STEELMAN concur.